UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHEELS UP PARTNERS LLC,<br><br>     Plaintiff,<br><br>  v.<br><br>EXCLUSIVE JETS, LLC,<br><br>     Defendant. | Case No.<br><br>**ECF Case** |

# COMPLAINT

Plaintiff Wheels Up Partners LLC ("Wheels Up") by and through it undersigned counsel. files this Complaint against Defendant Exclusive Jets, LLC, doing business as FlyExclusive ("FlyExclusive"), and states as follows:

## NATURE OF THE CASE

1. Wheels Up is a leading private jet charter company that allows members to book short-and-medium range private charter flights at an all-inclusive hourly rate. Since November 2021, Wheels Up has chartered flights from FlyExclusive, an owner and operator of private jets, pursuant to the parties' Fleet Guaranteed Revenue Program Agreement, dated November 1, 2021 (the "Agreement").

2. Without any prior notice, on the eve of the Fourth of July holiday weekend, one of the busiest private flying weekends of the year, FlyExclusive wrongfully terminated the Agreement and baselessly demanded hundreds of thousands of dollars to charter flights it was already contractually obligated to complete–despite the fact that FlyExclusive retained millions of dollars in deposits provided by Wheels Up under the Agreement. Under the Agreement, these deposits, which were sufficient to cover six months of flying activity, were eventually to be applied

to any amounts owed by Wheels Up at the end of the contract and the balance returned to Wheels Up. At 8:41 pm on Friday, June 30, 2023, FlyExclusive's CEO, Jim Segrave, emailed Wheels Up a Notice of Termination (the "Notice of Termination"), purporting to terminate the Parties' Agreement "effective immediately," despite the fact that FlyExclusive had no basis to do so.

3. Stuck between a rock and a hard place, and determined not to let FlyExclusive's surprise wrongful termination ruin the holiday weekend of more than 75 Wheels Up passengers, Wheels Up agreed to pay FlyExclusive the $300,000 "prepayment" it demanded in exchange for providing the already-chartered flights through the weekend. Although the Agreement does not entitle FlyExclusive to prepayment—it instead contemplates payment by Wheels Up within ten (10) days of invoice—Wheels Up had no choice but to pay in order to avoid significant service disruptions. Less than 24 hours later, FlyExclusive demanded an additional $300,000 as prepayment for two Sunday flights, despite the fact the total cost of Saturday's flights had eroded less than 65% of the "prepayment" already paid, leaving ample prepaid funds to cover Sunday's flights (even setting aside Wheels Up's multi-million dollar deposits, which were sufficient to cover approximately *six months* of flights). In light of Segrave's bad faith repudiation of FlyExclusive's obligations under the Agreement and coercive demands, Wheels Up instead rebooked its customers' flights with other operators for the remainder of the holiday weekend. Wheels Up brings this action as a result of FlyExclusive's improper termination of the Agreement. Wheels Up seeks damages for FlyExclusive's material breach of contract, including the return of Wheels Up's multi-million dollar deposits with FlyExclusive, which FlyExclusive has indicated it intends to wrongfully retain.

## PARTIES

4. Wheels Up is a leading provider of on-demand private aviation in the U.S. and one of the largest private aviation companies in the world. Wheels Up offers a complete global aviation

solution with a large, modern, and diverse fleet, backed by an uncompromising commitment to safety and service.  Customers can access membership programs, charter, aircraft management services and whole aircraft sales, as well as unique commercial travel benefits through a strategic partnership with Delta Air Lines.  The Wheels Up services brands also offer freight, safety & security solutions and managed services to individuals, industry, government and civil organizations.  Wheels Up is a limited liability company formed in Delaware whose principal place of business is in New York, NY and whose sole member is Wheels Up Partners Holdings LLC ("WUPH"), also a limited liability company formed in Delaware whose principal place of business is in New York, NY.  WUPH's sole managing member is Wheels Up Experience Inc., a Delaware corporation whose principal place of business is in New York, NY.  Wheels Up is therefore a citizen of New York and Delaware.

5. Defendant FlyExclusive is an owner and operator of private jets.  FlyExclusive is a limited liability company formed in North Carolina whose principal place of business is in Kinston, North Carolina.  The sole member of FlyExclusive is LGM Enterprises, LLC, which is wholly owned by Thomas J. ("Jim") Segrave, Jr., who is a citizen of North Carolina.  FlyExclusive conducts substantial business in the State of New York.

**JURISDICTION AND VENUE**

6. This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as diversity of citizenship exists among the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

7. As set forth above, the parties are citizens of different states: Wheels Up is a citizen of New York and Delaware and FlyExclusive is a citizen of North Carolina.

8. As of the date of this filing, Wheels Up is entitled to damages in excess of $75,000 based on FlyExclusive's stated refusal to return Wheels Up's multi-million dollar deposits, its

wrongful termination, and its wrongful demand for a $300,000 "prepayment" on the eve of the Fourth of July weekend, and the same wrongful demand for $300,000 that was made the very next day.

9. Pursuant to 28 U.S.C.A. § 1391, venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this district. Additionally, the Agreement provides that it "will be governed by and interpreted under the laws of the State of North Carolina, excluding its choice of law provisions." Although the Agreement permits jurisdiction in North Carolina courts, it does not prohibit litigation elsewhere. Wheels Up is therefore entitled to bring this action in the Southern District of New York, where it has suffered an injury caused by FlyExclusive's wrongful conduct.

## FACTUAL ALLEGATIONS

### *Relevant Provisions of the Agreement*

10. In October 2021, the parties negotiated a Fleet Guaranteed Revenue Program Agreement, which they executed on November 1, 2021. The purpose of the Agreement was for FlyExclusive to charter aircraft to Wheels Up. Pursuant to Section 19 of the Agreement, Wheels Up paid FlyExclusive tens of millions of dollars in 2021 as a Deposit[1] for guaranteed access to the initial Aircraft listed on Schedule A to the Agreement. Wheels Up has since deposited millions of dollars more to have additional aircraft added to the list. Further, Wheels Up guaranteed FlyExclusive a certain amount of Flight Hours per month for each Aircraft assigned to Wheels Up, to be reconciled by fleet on a monthly basis and on a quarterly basis.

11. The term of the Agreement began on November 1, 2021, the Effective Date, and was to continue a minimum of 28 months (including 18 months of normal operations and a

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the parties' Agreement.

minimum 10-month Draw Down Period), as provided under Section 4(a) of the Agreement. The Draw Down Period refers to the period of time following a notice of termination contemplated for the planned reduction in allocated flight capacity and the reintegration of that capacity into FlyExclusive's regular operations. Thus, the term of the Agreement was to last at a minimum through March 1, 2024. The Agreement provided that after the first eighteen months (i.e., after May 1, 2023), "the term will continue and the draw-down period will be postponed unless or until either Party gives the other Party a 30-day written notice of termination, in which case the Draw Down Period will begin on the 30th day after the notice was given."

12. Regarding billing, Section 17 of the Agreement provides that "hours flown charges, daily charges and incidentals will be tracked and billed weekly with payment due *within 10 days of invoice*" (emphasis added). Section 17 also requires FlyExclusive to reconcile hours flown monthly and provides that any hours not flown will be invoiced at a rate to be agreed upon to take into account variable cost not incurred by FlyExclusive. Each quarter, the hours flown are to be be re-reconciled and the appropriate true-ups of any under- and/or over-performance compared to the Guarantee, which provides a certain minimum amount of usage time for each aircraft assigned to Wheels Up per month, are to be invoiced in the first bill cycle after the end of the applicable quarter. The same section also provides that fuel rates may be adjusted quarterly based on the change in fuel costs. Further, Section 21(q) of the Agreement allows each party to deduct from monies owed to the other party any sum that such other party owes them, whether under the Agreement or another agreement.

13. The Agreement also provided the parties with certain termination rights. Per Section 4(a) of the Agreement, as of April 30, 2023, both parties were entitled to terminate on 30 days' notice, with the Draw Down Period beginning on the 30th day after the notice was given. Of

most relevance here, under Section 4(b), each side could terminate the Agreement if the other party committed a material breach (other than compliance, safety, or payment issues that had specific provisions), and such breach was not cured within 30 days.  Per Section 4(b)(iii), each side could also terminate the Agreement if the other party failed to make a payment on time, and such breach was not cured within 10 business days.  And Section 4(b)(iv) allowed each side to terminate if the other party had become the subject of bankruptcy or receivership proceedings or committed an act of insolvency.

14.     Notably, Section 4(d) provided that if Wheels Up terminated the Agreement due to a material breach by FlyExclusive, Wheels Up would owe FlyExclusive only for those obligations accrued under the Agreement until the early termination, and there would be no Draw Down Period.  The Deposits would be applied to any amounts owed by Wheels Up, and the balance returned to Wheels Up.

15.     By contrast, Section 4(e) provided that if FlyExclusive rightfully terminated the Agreement pursuant to Section 4(b) (which did not occur here), Wheels Up would owe FlyExclusive not only for those obligations accrued under the Agreement up until the early termination, but also for the minimum payment obligations per Aircraft listed in Schedule A until all such Aircraft are drawn down, less the costs saved by FlyExclusive from not having to operate the Aircraft.  Wheels Up's Deposits would be applied to the amounts owed under Subsection 4(e), FlyExclusive would be required to send Wheels Up a final statement of accounts within 45 days after termination, and Wheels Up would have to remit any payment due within 30 days after receipt of that final statement.

***FlyExclusive Materially Breaches and Repudiates the Agreement by Wrongfully Terminating***

16.     In an effort to wrongfully retain Wheels Up's Deposits, shirk its responsibilities under the Agreement, and extract additional funds from Wheels Up on one of the biggest private

aviation weekends of the year, FlyExclusive improperly claimed termination under Section 4(b) of the Agreement "effective immediately" and then demanded a $300,000 "prepayment" to conduct already-chartered flights, in breach of the Agreement.

17. On Friday June 30, 2023 at 8:41 p.m., without any prior notice, Jim Segrave emailed Wheels Up a Notice of Termination purporting to terminate the Parties' Agreement "effective immediately," under Section 4(b) of the Agreement. On its face, the Notice of Termination is insufficient as it offers no factual basis for FlyExclusive to invoke Section 4(b) (let alone without notice), and it was timed in a way that would cause maximum disruption and damage to Wheels Up.

18. The Notice of Termination cryptically claimed that "Wheels Up's failure to timely pay all amounts owed to [FlyExclusive] under the agreement, including but not limited to amounts due for the months of May and June constitute material breaches of the Agreement" and "these breaches have not been cured within ten (10) business days." The Notice of Termination failed to articulate the amount or date of any purportedly delinquent payment or when those amounts supposedly became due. Nor did it provide Wheels Up 10 business days to cure the alleged breach, as required by Section 4(b)(iii). Notably, before receiving FlyExclusive's Notice of Termination, Wheels Up had **not once** received written notice of a breach for a late payment. To the contrary, Wheels Up has consistently and promptly paid its weekly bills. Over the course of the parties' relationship, Wheels Up typically received invoices on Tuesday for the prior week's flights and paid on Friday, resulting in typical payments being made within 3 days of receipt of invoice (even though it had 10 days to pay under the Agreement).

19. Over the course of their relationship, the parties engaged in extensive discussions. For over a year, the parties have worked together in close communication to reconcile charges and

7

communicate any potential areas for further discussion. Starting in June 2022, the parties met on a daily basis to align on the number of hours flown, aircrafts assigned, and daily charges for the previous day. Crucially, the parties were actively engaged in this reconciliation process when FlyExclusive sent its abrupt termination, and FlyExclusive had never signaled its intent to terminate the Agreement or sent any notice to Wheels Up to that effect. Nor had FlyExclusive at any time asserted material late or non-payment by Wheels Up. To the contrary, as of June 30, before Wheels Up received FlyExclusive's Notice of Termination, the back-and-forth between the parties suggested the parties were commercially working towards alignment on all areas requiring reconciliation.

20. As recently as June 22, 2023, FlyExclusive sent Wheels Up a bill for the fuel and guaranteed portions of the Agreement for the "quarter" ended April 30, 2023, in the amount of $917,040.64. On June 27, 2023, Conner Hempel of Wheels Up thanked FlyExclusive for sending the bill and noted that FlyExclusive had set the quarter as ending on April 30, despite an earlier agreement to end that specific quarter on March 31 in order to align with the regular annual quarter schedule. Hempel also noted that, because there had been a discrepancy on the fuel cost calculation in the past, he was copying Wheels Up's SVP of Finance, Eric Cabezas, "for discussion/approval" for the surcharge bill. Per Section 17(a) of the Agreement, Wheels Up had 10 days (i.e., through July 2, 2023) to pay any amounts owed pursuant to the June 22, 2023 invoice.

21. FlyExclusive never responded to Mr. Hempel's email. Instead, three days later, FlyExclusive abruptly and inexplicably sent Wheels Up a Notice of Termination "effective immediately."

22. By announcing termination "effective immediately" on June 30, 2023 and refusing to complete any of the flights booked for the next day unless Wheels Up immediately sent a

"prepayment" of $300,000, FlyExclusive not only repudiated the Agreement, but also materially breached the very provisions of the Agreement it claimed to be invoking.

23. The Notice of Termination also counterfactually asserted that "Wheels Up's current state of insolvency constitutes a termination event under Section 4(b)(iv) of the Agreement." This was demonstrably false. Wheels Up was not "the subject of bankruptcy or receivership proceedings," nor had it "committed an act of insolvency" (as required for termination under Section § 4(b)(iv) of the Agreement).

24. The Notice of Termination also included an extortionate demand, which was plainly designed to provide FlyExclusive with a pretext for wrongfully retaining Wheels Up's Deposits. Although not supported by *any* reasonable reading of the Agreement, FlyExclusive claimed Wheels Up owed it nearly triple the amount of Wheels Up's Deposits and intended to apply the Deposits against that absurd amount. FlyExclusive did not provide the the breakdown of its calculations. No provision in the Agreement entitles FlyExclusive to effectively confiscate Wheels Up's Deposits, as it has done here.

### *Under Duress, Wheels Up Pays FlyExclusive $300,000 for FlyExclusive to Complete Booked Flights*

25. On the evening of Friday, June 30, 2023, upon receiving Segrave's unprecedented email attaching the purported Notice of Termination, Robert Withers, an EVP in Wheels Up's Operations group immediately called Segrave. Segrave then demanded a "prepayment" of $300,000 to provide the chartered flights booked through the weekend. Under Sections 5 and 17(a) of the Agreement, FlyExclusive was obligated to provide these flights and Wheels Up was to be invoiced for them only after their completion. Given the number of flights scheduled for July 1, 2023, the late hour, and Wheels Up unwavering commitment to its customers, Wheels Up had little choice but to agree to pay the "prepayment." With banks already closed, Wheels Up paid

FlyExclusive $100,000 that same evening via charge card, and agreed to pay an additional $100,000 at noon the following day (Saturday), with the final $100,000 at 3:00 p.m.

26. On July 1, 2023 at 12:30 a.m., Wheels Up responded with a counterproposal:

"Wheels Up will make three payments to FlyE as follows:

1. $100,000, which payment was made this evening;
2. $100,000 <u>at noon tomorrow</u>, July 1 if FlyE delivers the flight services on schedule <u>tomorrow morning</u>;
3. $100,000 <u>at 3 pm ET tomorrow</u>, July 1, if FlyE completes or has at least commenced the remaining flights of the day;
4. These payments are made and the flights shall be performed in accordance with the terms of the GRP agreement; and
5. If any flights are cancelled by Wheels Up members, the unused sums paid for those flights shall be applied to future services."

27. Withers explicitly noted that these payments were not to be construed as an admission. Withers also requested that Segrave confirm that he agreed to meet with Wheels Up's Interim CEO and CFO, Todd Smith, no later than 5:00 p.m. on Monday, July 3, to discuss the parties' respective claims under the Agreement. In a response email, Segrave stated he had "no issue with billing or how we reconcile flights *this weekend* against the three $100k payments you propose" (emphasis added). Declining the request for a meeting, Segrave stated he was "out of the country until the 9th." Notably, nowhere did Segrave suggest that the $300,000 was the cost for Saturday's flights, regardless of hours flown or the value of services rendered, nor did he suggest that it would cost Wheels Up even more to ensure FlyExclusive would cover Sunday's flights. Wheels Up then made the "prepayments" totaling $300,000 to FlyExclusive.

***FlyExclusive Reneges on its Promise to Complete Weekend Flights and Demands an Additional Payment of $300,000***

28. Despite having confirmed that the "prepayments" in the amount of $300,000 would cover the weekend flights, on July 1, 2023 at 4:19 p.m., FlyExclusive emailed Wheels Up

10

demanding another payment of $300,000 for FlyExclusive to complete the flights booked for Sunday, July 2, 2023.

29. This demand directly contradicted FlyExclusive's own email from the prior day, stating that the $300,000 "prepayment" covered "the flights this weekend," which FlyExclusive estimated to cost $197,251 and $55,035, respectively.

30. Faced with Segrave's repeated use of coercive tactics and bad faith, Wheels Up had no choice but to recognize that FlyExclusive had repudiated the Agreement. Rather than pay FlyExclusive another $300,000 to which it was not entitled, Wheels Up instead rebooked all remaining flights with alternate operators.

### *Impact of FlyExclusive's Wrongful Termination*

31. FlyExclusive has failed to fulfill its own contractual commitments, instead seeking to wrongfully appropriate millions of dollars of Wheels Up Deposits and demand "prepayment" for already-chartered flights after repudiating the Agreement. This conduct is a material breach of the Agreement. The timing of the Notice of Termination was plainly calculated in bad faith to inflict the greatest amount of harm and impose as much pressure as possible on Wheels Up, with complete disregard for Wheels Up's customers.

32. Indeed, FlyExclusive's wrongful termination of the Agreement "effective immediately" on the eve of the busiest flying weekend of the season had immediate consequences for Wheels Up, which was not only forced to pay $300,000 it did not owe, but also scramble to rebook its customers' flights with other operators with no notice. Thanks to the relentless efforts of its team, Wheels Up was able to secure alternate bookings for its customers for the remainder of the holiday weekend. Moreover, FlyExclusive's baseless refusal to refund the balance of the

Deposits after improperly terminating the Agreement has harmed and continues to harm Wheels Up.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION - BREACH OF CONTRACT

**Section 4 (Term & Termination) and Section 5 (Obligation and Cooperation of Parties)**

33. Wheels Up incorporates by reference all preceding paragraphs of its Complaint as if fully set forth herein.

34. Wheels Up and FlyExclusive are parties to the Agreement. Neither party has challenged the validity of the Agreement.

35. The plain and unambiguous language of the Agreement entitles Wheels Up to a 30-day written notice of termination. The Agreement also provides that Wheels Up is entitled to receive the balance of its Deposits following the Draw Down Period, if applicable, and immediately, in the event of a material breach by FlyExclusive (as occurred here).[2]

36. FlyExclusive committed a material breach of contract when it purported to terminate the Agreement between the parties pursuant to Section 4(b) without any valid basis to do so.

37. To justify its breach, FlyExclusive relied on false claims that Wheels Up failed to "timely pay all amounts owed to [FlyExclusive] under the Agreement" and that Wheels Up was in a "current state of insolvency." Even if Wheels Up had failed to make a timely payment (which it did not), Section 4(b)(iii) of the the Agreement entitled it to a 10-day cure period, during which

---

[2] Given FlyExclusive's material breach of the Agreement and repudiation thereof, the final accounting of amounts owed under the Agreement should be calculated under Section 4(d). Namely, Wheels Up owes FlyExclusive only for obligations accrued until June 30, 2023, there shall be no Draw Down Period, the Deposits are to be applied to any amounts owed by Wheels Up, and the balance returned to Wheels Up.

FlyExclusive must continue to perform pursuant to the terms of the Agreement. And, contrary to FlyExclusive's conclusory allegation, Wheels Up was not in a "current state of insolvency."

38. FlyExclusive's email attaching the Notice of Termination unequivocally communicated its intent to repudiate its contractual duties and not give WheelsUp the benefit of either the 30-day notice to which it is entitled under Section 4(a) of the Agreement, or the 10-day cure period to which it is entitled in the case of alleged non-payment under Section 4(b) of the Agreement.

39. Further, FlyExclusive purported to calculate costs it is not entitled to under any reasonable reading of the Agreement in order to wrongfully retain Wheels Up's Deposits.

40. Wheels Up has performed under the Agreement in all material respects and remained ready, willing, and able to perform its duties under the Agreement.

41. FlyExclusive's wrongful termination of the Agreement has damaged Wheels Up in an amount to be proven at trial, including but not limited to the wrongfully retained Wheels Up's Deposits and "prepayments" in the amount of $300,000.

## SECOND CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

42. Wheels Up incorporates by reference all preceding paragraphs of its Complaint as if fully set forth herein.

43. The Agreement, the relationship between FlyExclusive and Wheels Up, and the common law imply a covenant of good faith and fair dealing between FlyExclusive and Wheels Up.

44. FlyExclusive breached its duty of good faith and fair dealing by abruptly terminating the Agreement without a valid basis and with no prior notice the eve of one of the busiest travel weekends of the year. FlyExclusive's bad faith is further evidenced by its refusal to

Case 1:23-cv-05720   Document 1   Filed 07/05/23   Page 14 of 15

complete the already-chartered weekend flights unless Wheels Up paid it $300,000 within hours, and its coercive demand less than 24 hours later for further payment of $300,000 to complete flights scheduled on Sunday, July 2, 2023, despite the fact the existing "prepayment" more than covered those flights (in addition to the millions of dollars of Deposits, which were sufficient to cover six months of flights).

45. Accordingly, FlyExclusive has engaged in conduct that injures Wheels Up's right to receive the benefits of the Agreement, and deprived Wheels Up of the fruits of its bargain under the Agreement, in breach of the implied covenant of good faith and fair dealing.

46. FlyExclusive's actions have caused serious harm to Wheels Up, warranting compensatory damages.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff Wheels Up respectfully asks that this Court:

47. Find that FlyExclusive's wrongful termination of the Agreement constituted a repudiation and material breach of the Agreement;

48. Find that FlyExclusive's wrongful termination and refusal to perform under the Agreement without "prepayments" constituted a breach of the implied covenant of good faith and fair dealing;

49. Award Wheels Up compensatory damages for FlyExclusive's breaches of the Agreement in an amount to be determined at trial;

50. Award Wheels Up all expenses for this action, including costs and fees; and

51. Award such other and further relief as the Court may deem just and proper.

Dated: New York, New York
July 5, 2023

Respectfully submitted,

/s/ Rachel M. Fritzler

Rachel M. Fritzler
Lindsey Weiss Harris
Hannah Geis
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4020
Facsimile: (212) 446-4900
Rachel.fritzler@kirkland.com
Lindsey.harris@kirkland.com
Hannah.geis@kirkland.com

*Attorneys for Plaintiff Wheels Up Partners LLC*